933 So.2d 57 (2006)
B.B., Father of J.M., a child, Appellant,
v.
P.J.M. and K.M., Appellees.
No. 1D05-0510.
District Court of Appeal of Florida, First District.
May 22, 2006.
Rehearing Denied July 7, 2006.
*58 Gertrude Kehne, Jacksonville, for Appellant.
Michael A. Shorstein, of Shorstein & Kelly, P.A., Jacksonville, and Michael J. Korn, of Korn & Zehmer, P.A., Jacksonville, for Appellees.
HAWKES, J.
We address the necessity of obtaining an unmarried biological father's consent to the adoption of his child. Florida law requires the father's consent once he has been identified by any one of several statutorily enumerated methods. Because Appellant was identified by one of the statutorily required methods, the trial court's order of adoption, entered without Appellant's consent, is reversed.

Factual and Procedural Background
J.M. was born out of wedlock. At the time of her birth, both J.M. and her mother tested positive for cocaine. Her father, Appellant, was incarcerated. As a consequence of the mother's cocaine use, the Department of Children and Families (DCF) pursued dependency proceedings under chapter 39, Florida Statutes (2004). The Shelter/Detention Order, Petition for Dependency, Case Plan, Order on Arraignment, Predisposition Study, and Petition for Family Adoption all identified Appellant as J.M.'s father without contest. Appellant participated fully in these proceedings.
Several months into the chapter 39 dependency proceedings, J.M.'s mother executed a written consent for her parents, the maternal grandparents, to adopt J.M. pursuant to chapter 63, Florida Statutes (2004).[1] Upon receiving notice of the intended adoption, J.M.'s father filed an objection. The trial court found Appellant had no legal basis to object, concluding his consent to the adoption was not required under chapter 63 because, as an unmarried biological father, he did not timely identify *59 himself as J.M.'s father through registration. The father argues the trial court erred in reaching this conclusion. We agree.

The Persons Required to Consent to Adoption
The persons required to consent to an adoption of a minor child are enumerated under section 63.062(1). The father's consent is required when any one of the following five conditions are satisfied:
1. The minor was conceived or born while the father was married to the mother;
2. The minor is his child by adoption;
3. The minor has been established by court proceeding to be his child;
4. He has filed an affidavit of paternity pursuant to s. 382.013(2)(c); or

5. In the case of an unmarried biological father, he has acknowledged in writing, signed in the presence of a competent witness, that he is the father of the minor, has filed such acknowledgment with the Office of Vital Statistics of the Department of Health within the required timeframes, and has complied with the requirements of subsection (2).
§ 63.062(1)(b), Fla. Stat. (emphasis added).
The legislative intent behind chapter 63 is to prevent the disruption of an adoption when the father has not been identified prior to adoptive placement. See J.S. v. S.A., 912 So.2d 650, 661-62 (Fla. 4th DCA 2005). The statute waives the necessity of obtaining a father's consent to an adoption when he has not been previously identified through one of the five methods delineated in section 63.062(1)(b). See § 63.062(1)(b)1-5, Fla. Stat. However, where the father has been identified in a timely fashion, and can be held accountable, due process requires his consent. In summary, chapter 63 prevents an absent or unknown father who has "sat on his rights" from creating uncertainty as to the finality of an adoption. See J.S., 912 So.2d at 661.
Apparently, because J.M.'s father was an unmarried biological father and subsection (b)5 begins with the phrase "[i]n the case of an unmarried biological father," the trial court only considered that subsection. This was error. By the terms of the provisions themselves, any man who meets the requirements of subsections (b)2, (b)3, and (b)4 could be the "unmarried biological father" of the minor. Thus, subsection (b)5 is not a default provision under which all unmarried biological fathers must qualify to protect their parental rights  it is merely one statutory method among five to identify a child's father.
Here, Appellant met the provisions of subsection (b)3, which requires a father's consent to an adoption when his identity as the child's father has been "established by court proceeding." The phrase "established by court proceeding" is not limited to a formal paternity adjudication under chapter 724, Florida Statutes (2004).[2] Rather, any time a court makes a factual determination as to the identity of a minor child's father, and the determination is material in the proceeding before the court, that proceeding qualifies as a "court proceeding" under subsection (b)3.[3]

*60 A Dependency Proceeding Qualifies as a "Court Proceeding"

For a court to perform its duties in a dependency proceeding, it must, if possible, determine the identity of the minor child's father. Consequently, this determination is material to the dependency proceeding. For example, section 39.013 requires both parents to be advised of their right to counsel at each stage of the dependency proceedings. Section 39.502 requires all parents to be notified of every proceeding or hearing involving the child. When DCF takes custody of a child, it is required to obtain the names of "all parents and prospective parents ... so far as [they] are known." See §§ 39.301(15) & 39.401(4), Fla. Stat. (emphasis added). If the identity of a parent is unknown when a dependency petition is filed, the court is required to make its own inquiry to discover the parent's identity. See § 39.503, Fla. Stat. If the identity of a parent is discovered, but his or her location is unknown, DCF is required to conduct a diligent search to determine the parent's whereabouts. See § 39.503(5), Fla. Stat. Finally, before making a permanency determination, such as a chapter 63 adoption, the dependency court must determine reunification with either parent is inappropriate. See § 39.621(1), Fla. Stat. Clearly, the identity of a child's father is material in a dependency proceeding.

Material Facts Are Established By Court Proceedings
Material facts are "established" by court proceedings in one of two ways. They are either disputed or undisputed. Disputed facts are established by contest when a court or jury weighs evidence presented by each party and makes either an implied or express finding. Undisputed facts, on the other hand, are established by stipulation or agreement among the parties. A stipulation or agreement exists when a fact material to the court proceeding is not contested by the parties and is accepted as true by the court. Acceptance of a material fact by the parties and court can be implied or express.
Appellant's identity as J.M.'s father, a material fact in the dependency proceeding, was agreed to by all interested parties and accepted as true by the court throughout the dependency proceedings. Appellant participated in the dependency proceedings to the fullest extent possible. J.M.'s mother said Appellant was J.M.'s father; Appellant acknowledged he was J.M.'s father; both DCF and the Guardian Ad Litem concurred Appellant was J.M.'s father; the maternal grandparents, who wish to adopt J.M., agreed and never contested Appellant was J.M.'s father; and the trial judge accepted and acted on the fact Appellant was J.M.'s father. In short, every entity with any role or standing in the case accepted and agreed upon the material fact that Appellant was J.M.'s father. In fact, the trial court appointed Appellant counsel solely because he was J.M.'s father. Again, the statute requires only that paternity be "established," not "adjudicated."[4]
Accordingly, Appellant was "established by court proceeding" to be J.M.'s father. See In Re S.M.A.L., 902 So.2d 328, 329 n. 1 (Fla. 2d DCA 2005) (finding the appellant was the child's biological father because he *61 was referred to as the biological father throughout the dependency proceedings and his paternity was not contested).

Due Process Observations
The dissent asserts the issue of whether Appellant was "established" as J.M.'s father was not preserved and cannot be considered. However, the father specifically argued before the trial court and on appeal that (1) his consent was required before J.M. could be adopted, and (2) it violated his due process rights to allow the adoption without his consent based on a failure to register pursuant to subsection (b)5. Consequently, this issue is preserved.
The record establishes Appellant was in court, litigating to protect his parental rights in a chapter 39 dependency proceeding. He did not "sit on his rights" or "remain on the fence indefinitely" as did the father in J.S.
Appellant's status as J.M.'s father was never at issue in the dependency proceeding. The issues were: (a) whether J.M. was dependant, and, if so, (b) what was the least restrictive means to protect her. However, ten months into the dependency proceedings, Appellant learned there were some changes:
1. The type of proceeding had changed. The old proceeding was a chapter 39 dependency proceeding; the new proceeding was a chapter 63 adoption proceeding.
2. The contested issue had changed. The old issues of dependency and protection of J.M. were out. The new issue was Appellant's failure to register.
3. With registration now the issue, the trial court determined that, during the time Appellant was in court litigating J.M.'s dependency as J.M.'s father, the clock had run and Appellant missed the "registration" deadline to formally notify the court he was J.M.'s father.
"[T]he term `due process' embodies a fundamental conception of fairness." Scull v. State, 569 So.2d 1251, 1252 (Fla. 1990); Ryan's Furniture Exch., Inc. v. McNair, 120 Fla. 109, 162 So. 483, 487 (1935) ("In observing due process of law, the opportunity to be heard must be full and fair, not merely colorable or illusive."); L.W. v. Dep't of Health & Rehab. Servs., 695 So.2d 724, 726 (Fla. 1st DCA 1996) ("Although the due process required in the juvenile dependency context is not amenable to precise definition, it is viewed as expressing the requirement of `fundamental fairness.'").
Here, the court accepted Appellant as J.M.'s father, and granted him all the rights that would inure to him as her father during the dependency proceedings. The trial court then permitted the adoption of J.M. without Appellant's consent, because Appellant did not formally identify himself to the court as the father through registration. Clearly, the trial court did not provide a process that "embodies a fundamental conception of fairness." Quite the contrary, the trial court violated Appellant's right to due process.

Conclusion
Since J.M. has been "established by court proceeding" to be Appellant's child, and his parental rights have not been terminated, section 63.062(1)(b)3 requires Appellant's consent prior to the adoption of J.M. by her maternal grandparents.
REVERSED and REMANDED for proceedings consistent with this opinion.
THOMAS, J., concurs; WOLF, J., dissents with opinion.
*62 WOLF, J., Dissents.
The majority's reversal of the trial court's order of adoption is in error. The question posed by this case is whether an unmarried putative biological father, who has taken no affirmative steps to establish his paternity relative to his putative child, should be considered the child's "father" for purposes of the Florida Adoption Act, see ch. 63, Fla. Stat. (2004), and be required to give his consent to a proposed adoption of the child by others. Despite the issue having never been raised by B.B. in either the trial court or this court, the majority proclaims that B.B.'s consent to the proposed adoption was required, pursuant to section 63.062(1)(b)3., Florida Statutes (2004), because he had been "established by court proceeding" to be J.M.'s father. The majority's application of section 63.062(1)(b)3. in this case is unsupported by the facts, directly contravenes the expressed legislative intent set forth in the Florida Adoption Act, and directly conflicts with prior case law from this court as well as overwhelming precedent from around the country.

FACTS AND PROCEDURAL HISTORY
This case began with the filing of a Detention Petition on February 17, 2004, by an agent of DCF. The Detention Petition indicated that J.M. had been born on January 18, 2004, and made a preliminary identification of B.B. as the birth father.
On the next day, February 18, 2004, the trial court entered a Shelter/Detention Hearing Order placing J.M. in the physical custody of appellees, but under the protective supervision of DCF. This Order appears have been a form order, containing various boxes which were either checked or not checked. It is unclear from this record how the Shelter/Detention Hearing Order was actually prepared. Although the box was checked stating that B.B. was the "father" of J.M., another box was checked stating that B.B. had been "present" at the detention hearing. This was incorrect; B.B. was (and remains) incarcerated in the New River Correctional Institution. What is clear is that the Shelter/Detention Order contained no indicia that the trial court ever made any independent judicial "findings" about J.M.'s paternity based on the presentation of any evidence bearing on that fact. The form Order merely identified B.B. as J.M.'s "father" in the most general sense.
DCF thereafter filed a Petition for Dependency. In this petition, DCF alleged that B.B. was the "father" of the child, that his address was New River Correctional Institution, and that B.B. had never been married to the child's mother. DCF's petition erroneously stated that B.B. was "listed on the child's birth certificate." J.M.'s actual birth certificate, a copy of which appears in the record on appeal, does not in any way identify B.B. as the child's father. DCF's subsequent Case Plan also made virtually no reference to B.B., except to note that he had "failed to take an active role in the child's life resulting in his failure to protect the child from being born substance exposed," and that he remained incarcerated.
An arraignment hearing on the Petition for Dependency took place on March 10, 2004. The purpose of the hearing was to advise the mother and B.B. "as to the allegations contained in the Petition for Dependency," and for the mother and B.B. to enter "pleas" either admitting the factual allegations stated in the petition (thereby obviating the need for an evidentiary hearing to establish the truth of those allegations), denying the truth of the allegations stated in the petition, or simply consenting to an adjudication of dependency which would neither admit nor deny the *63 truth of the allegations stated in the petition. Due to his incarceration, B.B. did not appear at this hearing. The mother appeared with her attorney at the hearing and entered a "plea" denying the truth of the allegations stated in the Petition for Dependency.
During a pretrial hearing which took place on March 31, 2004, the mother, for all intents and purposes, changed her "plea" and signed a document consenting to J.M. being adjudicated dependent. Based on this document, the trial court signed an order that same day adjudicating J.M. a dependent child. The trial court also issued an order that same day scheduling the final disposition hearing for the following month. Like the Shelter/Detention Order, neither of these orders contained any judicial "findings" about J.M.'s paternity based on the presentation of any evidence bearing on that fact.
Despite having already adjudicated J.M. a dependent child based on the mother's consent document, the trial court inexplicably entered the Order on Arraignment on April 1, 2004, recognizing only the mother's March 10, 2004, denial of the truth of the allegations stated in the petition, finding "probable cause to believe that the child [was] dependent," and again adjudicating J.M. a dependent child. The only mention made of B.B. in this order was to the fact that he had not appeared at the arraignment hearing due to his incarceration. Like all previous orders in the case, the trial court again made no specific judicial "findings" in this order concerning J.M.'s paternity.
In keeping with statutory requirements,[5] a General Master[6] conducted a judicial review hearing on July 22, 2004. In the resulting order reaffirming J.M.'s dependency, determining that the mother had substantially complied with her Case Plan, and returning physical custody of the child to her mother, no reference was made to B.B. having been J.M.'s father, or to B.B. having played any role in the child's life up to that point in time.
Meanwhile, after the judicial review hearing but before issuance of the resulting order, appellees filed, under the dependency action case number, their Petition for Family Adoption pursuant to section 63.087, Florida Statutes (2004). The petition specifically alleged that B.B.'s consent to the proposed adoption was not required as he had failed to comply with the provisions of section 63.062, Florida Statutes (2004), applicable to unmarried biological fathers. In support of this assertion, appellees submitted to the trial court certificates from the Office of Vital Statistics of the Florida Department of Health establishing that diligent searches of the Florida Putative Father Registry, on July 21, 2004, and August 11, 2004, had revealed no claims of paternity to J.M. since her birth. The trial court thereafter appointed counsel to represent B.B. during the remainder of the proceedings.
The issue of whether section 63.062(1)(b)3., Florida Statutes (2004), was even implicated in these proceedings by virtue of B.B. having been named as the child's father in the context of the dependency-phase of the case, was never raised either by B.B. in his pro se response to the *64 Petition for Family Adoption filed before the appointment of counsel, or by his attorney in the extensive memorandum of law filed in opposition to the Petition for Family Adoption. These pleadings filed by B.B. and his counsel never argued that B.B.'s status as J.M.'s "father" had already been "established by court proceeding." Instead, they argued that B.B. had sufficiently complied with sections 63.062(1)(b)5. and 63.062(2), Florida Statutes (2004), to preserve his rights, as the child's "father," to notice and consent to the adoption.
In his pro se initial brief, B.B. similarly never argued that his status as J.M.'s "father" had already been "established by court proceeding" such that his consent to the proposed adoption was statutorily required. The legal theory upon which the majority's reversal is based became an issue in these proceedings only after briefing when the court issued a sua sponte order directing the parties to submit supplemental briefs addressing the issue.

ANALYSIS
"[I]t is well settled that legislative intent is the polestar that guides a court's statutory construction analysis." Reynolds v. State, 842 So.2d 46, 49 (Fla.2002); State v. J.M., 824 So.2d 105, 109 (Fla.2002). To discern legislative intent, we are to look "primarily" to the actual language used in the statute. See Golf Channel v. Jenkins, 752 So.2d 561, 564 (Fla.2000). It is not the duty or the prerogative of the courts to modify clearly expressed legislative intent in order to further particular policy favored by the court. See Limbaugh v. State, 887 So.2d 387, 398 (Fla. 4th DCA 2004) (citing Holly v. Auld, 450 So.2d 217, 219 (Fla.1984)).
This case requires construction of the Florida Adoption Act as amended in 2003. See ch. 63, Fla. Stat. (2004); see also ch.2003-58, Laws of Fla. The revised statutory scheme contains several provisions and concepts new to Florida law, many relating to the rights of unmarried, putative biological fathers. The most significant change in the statutory scheme, as a result of the 2003 revisions, was the creation of the Florida Putative Father Registry. Section 63.054(1), Florida Statutes (2004), specifically provides,
In order to preserve the right to notice and consent to an adoption under this chapter, an unmarried biological father must, as the "registrant," file a notarized claim of paternity form with the Florida Putative Father Registry maintained by the Office of Vital Statistics of the Department of Health and shall include therein confirmation of his willingness and intent to support the child for whom paternity is claimed in accordance with state law. The claim of paternity may be filed at any time prior to the child's birth, but a claim of paternity may not be filed after the date a petition is filed for termination of parental rights [pending adoption].
The Legislature's stated purpose in enacting the 2003 revisions to the Florida Adoption Act was to bring certainty and uniformity to Florida's adoption procedures by balancing the rights of the child, the birth mother, the putative biological father, and the adoptive parents in an effort to prevent protracted litigation in adoption cases, which is undeniably harmful to the child,[7] to ensure the integrity of *65 adoptive placements and the finality of adoptions, to encourage responsible fatherhood, and to combat fraud. This legislative intent is specifically expressed in sections 63.022, and 63.053, Florida Statutes (2004). Section 63.022 states,
(1) The Legislature finds that:
(a) The state has a compelling interest in providing stable and permanent homes for adoptive children in a prompt manner, in preventing the disruption of adoptive placements, and in holding parents accountable for meeting the needs of children.
(b) An unmarried mother faced with the responsibility of making crucial decisions about the future of a newborn child is entitled to privacy, has the right to make timely and appropriate decisions regarding her future and the future of the child, and is entitled to assurance regarding an adoptive placement.
(c) Adoptive children have the right to permanence and stability in adoptive placements.
(d) Adoptive parents have a constitutional privacy interest in retaining custody of a legally adopted child.
(e) An unmarried biological father has an inchoate interest that acquires constitutional protection only when he demonstrates a timely and full commitment to the responsibilities of parenthood, both during the pregnancy and after the child's birth. The state has a compelling interest in requiring an unmarried biological father to demonstrate that commitment by providing appropriate medical care and financial support and by establishing legal paternity rights in accordance with the requirements of this chapter.

(2) It is the intent of the Legislature that in every adoption, the best interest of the child should govern and be a foremost concern in the court's determination. The court shall make a specific finding as to the best interest of the child in accordance with the provisions of this chapter.
(Emphasis added.) Section 63.053 states,
(1) In enacting the provisions contained in this chapter, the Legislature prescribes the conditions for determining whether an unmarried biological father's actions are sufficiently prompt and substantial so as to require protection of a constitutional right. If an unmarried biological father fails to take the actions that are available to him to establish a relationship with his child, his parental interest may be lost entirely, or greatly diminished, by his failure to timely comply with the available legal steps to substantiate a parental interest.

(2) The Legislature finds that the interests of the state, the mother, the child, and the adoptive parents described in this chapter outweigh the interest of an unmarried biological father who does not take action in a timely manner to establish and demonstrate a relationship with his child in accordance with the requirements of this chapter. An unmarried biological father has the primary responsibility to protect his rights and is presumed to know his child may be adopted without his consent unless he complies with the provisions of this chapter and demonstrates a prompt and full commitment to his parental responsibilities.

*66 (Emphasis added.)[8]
Of particular significance in this case is the Legislature's specific recognition, consistent with long-standing United States Supreme Court precedent, that an unmarried biological father has only "an inchoate interest that acquires constitutional protection" if he takes certain specified steps demonstrating his commitment to the responsibilities of parenthood. See Lehr v. Robertson, 463 U.S. 248, 256-65, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). In Lehr, where the Supreme Court rejected an unmarried biological father's due process challenge to New York's putative father registry statute, the Court commented,
When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the due process clause. At that point it may be said that he acts as a father toward his children. But the mere existence of a biological link does not merit equivalent constitutional protection.. . .
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie.

Id. at 261-62, 103 S.Ct. 2985 (internal citations, quotations, quotation alterations, and footnotes omitted) (emphasis added).
In fact, the Supreme Court in Lehr specifically held that even though the unmarried biological father in that case had initiated a paternity action in another county during the pendency of an adoption proceeding involving the same child, New York had adequately protected his right to form a parent-child relationship with his child through the requirements of that state's putative father registry, and his failure to comply with the statute "[b]y mailing a postcard to the putative father registry" which would "have guaranteed that he would receive notice of any proceedings to adopt [the child]" meant that no due process violation occurred when the New York court handling the adoption proceeding entered a final order of adoption without providing him with notice or an opportunity to object to the adoption. See id. at 252-53, 263-65, 103 S.Ct. 2985. Subsequent case law from other states with putative father registries has similarly demanded such strict compliance with the registration requirements of similar statutes as a prerequisite to the assertion *67 of any parental right or interest by an unmarried biological father.[9]
The legislative intent behind the 2003 amendments to the Florida Adoption Act, which is specifically expressed by the Florida Legislature, is implemented throughout the remaining provisions of the statute. Section 63.062(1), Florida Statutes (2004), lists those persons who are required to consent to an adoption. Section 63.062(1)(b) specifically requires the consent of the "father of the minor," only under the following circumstances:
1. The minor was conceived or born while the father was married to the mother;
2. The minor is his child by adoption;
3. The minor has been established by court proceeding to be his child;
4. He has filed an affidavit of paternity pursuant to s. 382.013(2)(c); or
5. In the case of an unmarried biological father, he has acknowledged in writing, signed in the presence of a competent witness, that he is the father of the minor, has filed such acknowledgment with the Office of Vital Statistics of the Department of Health within the required timeframes, and has complied with the requirements of subsection (2).
In section 63.062(2), Florida Statutes (2004), clear and unambiguous time frames are delineated within which an unmarried biological father must register with the Florida Putative Father Registry and demonstrate certain other indicia of his commitment to fatherhood in order to preserve *68 his parental rights such that his consent to a proposed adoption of the child would be required. Section 63.062(2)(b), Florida Statutes (2004), which governs those situations in which the child is younger than six months of age at the time of placement with the adoptive parents, specifically requires an unmarried biological father to have performed all of the following acts "prior to the time the mother executes her consent for adoption":
1. Filed a notarized claim of paternity form with the Florida Putative Father Registry within the Office of Vital Statistics of the Department of Health, which form shall be maintained in the confidential registry established for that purpose and shall be considered filed when the notice is entered in the registry of notices from unmarried biological fathers.
2. Upon service of a notice of an intended adoption plan or a petition for termination of parental rights pending adoption, executed and filed an affidavit in that proceeding stating that he is personally fully able and willing to take responsibility for the child, setting forth his plans for care of the child, and agreeing to a court order of child support and a contribution to the payment of living and medical expenses incurred for the mother's pregnancy and the child's birth in accordance with his ability to pay.
3. If he had knowledge of the pregnancy, paid a fair and reasonable amount of the expenses incurred in connection with the mother's pregnancy and the child's birth, in accordance with his financial ability and when not prevented from doing so by the birth mother or person or authorized agency having lawful custody of the child.
(Emphasis added.)
The statute is unmistakably clear about the consequences of an unmarried biological father's failure to timely register his claim of paternity with the Florida Putative Father Registry. Section 63.062(2)(d), Florida Statutes (2004), states,
An unmarried biological father who does not comply with each of the conditions provided in this subsection is deemed to have waived and surrendered any rights in relation to the child, including the right to notice of any judicial proceeding in connection with the adoption of the child, and his consent to the adoption of the child is not required.

(Emphasis added.)
The unequivocal and black letter provisions of the Florida Adoption Act as a whole indicate that an unmarried biological father need not consent to the proposed adoption of his purported child unless he previously established his commitment to the parent-child relationship through compliance with statutory prerequisites. In this case, B.B. never took any of the statutorily delineated steps toward maturing into a fully vested right whatever "inchoate" interest he may have had to being J.M.'s father such that he had any right to object to the proposed adoption.
The majority focuses on section 63.062(1)(b)3., Florida Statutes (2004), out of context, and reaches the erroneous conclusion that B.B.'s consent to the proposed adoption was statutorily required. In support of this conclusion, the majority relies on the mere identification of B.B. as J.M.'s "father" in the dependency pleadings and orders leading up to the filing of appellees' Petition for Family Adoption. However, as previously noted, neither B.B. nor his trial-level court-appointed counsel ever argued that B.B. should have been required to consent to the proposed adoption because he had been "established by court proceeding" in the dependency-phase of the case to have been J.M.'s "father." *69 B.B. also never himself advanced this argument as a reason for reversal of the final order of adoption.
It is well settled that "[i]n order to be preserved for further review by a higher court, an issue must be presented to the lower court and the specific legal argument or ground to be argued on appeal or review must be part of that presentation if it is to be considered preserved." Tillman v. State, 471 So.2d 32, 35 (Fla.1985), quoted in Sunset Harbour Condo. Ass'n v. Robbins, 914 So.2d 925 (Fla.2005), and Bryant v. State, 901 So.2d 810, 822 (Fla.2005). In addition, it is equally well-settled that this court will not consider issues that are not timely raised by an appellant in his initial brief. See, e.g., Mercury Ins. Co. of Fla. v. Coatney, 910 So.2d 925, 927 n.2 (Fla. 1st DCA 2005); Williams v. State, 845 So.2d 987, 989 (Fla. 1st DCA 2003); Mathis v. Fla. Dep't of Corr., 726 So.2d 389, 392 n.5 (Fla. 1st DCA 1999). As the Fourth District Court of Appeal observed in J.A.B. Enters. v. Gibbons, 596 So.2d 1247, 1250 (Fla. 4th DCA 1992), "An issue not raised in an initial brief is deemed abandoned." See also Hall v. State, 823 So.2d 757, 763 (Fla.2002) (refusing to consider argument made for the first time in appellant's reply brief).
Even if the legal theory upon which the majority has based its reversal in this case had been properly preserved for appellate review, and actually timely raised by B.B. as a basis for reversal of the adoption order, the majority's broad interpretation of section 63.062(1)(b)3., allowing for the mere identification of a man as a child's father in the context of a court proceeding to constitute an establishment of that man's legal status as the child's father for purposes of the Florida Adoption Act, is inconsistent with the stated legislative intent behind the Act.
The clear reason for the inclusion of the language in section 63.062(1)(b)3., relied upon by the majority, was to protect a father whose legal status had already been judicially established by means of a paternity judgment or other actual trial proceeding. Such a person should properly be afforded certain protections; however, the legally established status of such an individual is far different than the uncertain and unadjudicated status of an unmarried putative biological father like B.B.
In this case, the trial court never declared B.B. to be J.M.'s legal father at any point during the dependency proceedings: there is no indication that either party to the dependency action specifically sought such a determination; B.B. never affirmatively acknowledged paternity in the context of the dependency proceedings; and no evidence was ever presented in the context of the dependency proceedings to support a finding of paternity. Whether B.B.'s identity as the child's father was "contested" or "accepted" in the context of the dependency proceeding is irrelevant; the mere identification of him as the child's father in that proceeding did not give rise to a declaration as a matter of law that B.B. is the child's father such that it can reasonably be said that the child was "established by court proceeding to be his child." See § 63.032(19), Fla. Stat. (2004) (defining the phrase "unmarried biological father" to mean a man who "has not been declared by a court of competent jurisdiction to be the legal father of the child").
Even if, as this court noted in the order directing supplemental briefing, B.B.'s "identity as his child's father was never contested and was accepted as true by the trial court and all interested persons," the concept of "identifying" a man as a child's father is distinguishable from the concept of "establishing" whether the man is the child's legal father. The validity of this *70 distinction is buttressed by the inclusion in the Florida Adoption Act of the requirements of section 63.088(4), Florida Statutes (2004):
In proceedings initiated under s. 63.087, the court must conduct an inquiry of the person who is placing the minor for adoption and of any relative or person having legal custody of the minor who is present at the hearing and likely to have the following information regarding the identity of:
(a) Any person to whom the mother of the minor was married at any time when conception of the minor may have occurred or at the time of the birth of the minor;
(b) Any person who has been declared by a court to be the father of the minor;
(c) Any man who has adopted the minor;
(d) Any man with whom the mother was cohabiting at any time when conception of the minor may have occurred; and
(e) Any person who has acknowledged or claimed paternity of the minor.
The information required under this subsection may be provided to the court in the form of a sworn affidavit by a person having personal knowledge of the facts, addressing each inquiry enumerated in this subsection, except that, if the inquiry identifies a father under paragraph (a), paragraph (b), or paragraph (c), the inquiry shall not continue further.. . .
(Emphasis added.) By providing the required information by affidavit, a person having personal knowledge of the facts cannot be said to be "establishing" the paternity of the child, nor would the disclosure of the "identity" of someone falling into one of the specified categories of potential fathers constitute any acquiescence or acknowledgment of paternity of the child. This statutory requirement merely allows for the identification of potentially interested men who might be "fathers" whose consent to the adoption might be required pursuant to section 63.062(1)(b), Florida Statutes (2004). The identification of potential fathers required by section 63.088(4) is comparable to DCF's "identification" of B.B. as the child's "father" in the dependency proceedings.
The inevitable result of the majority's interpretation of section 63.062(1)(b)3. will be that, by filing the affidavit authorized by section 63.088(4), a party having personal knowledge of the facts in an adoption case will always be "establishing by court proceeding" that the unmarried biological father of the child is the child's legal father entitled to consent to the child's adoption pursuant to section 63.062(1)(b)3. In other words, the majority's interpretation of section 63.062(1)(b)3. effectively eliminates the specific statutory registration requirements applicable to all unmarried putative biological fathers.
The fundamental object to be sought in construing statutes is to fulfill legislative intent, not to defeat it. See Sunset Harbour, 914 So.2d at 929. It cannot be seriously suggested that the Legislature intended that the statutory registration requirements applicable to unmarried putative biological fathers could be so easily avoided simply by interpreting the "established by court proceeding" language contained in section 63.062(1)(b)3. as broadly as the majority's opinion does in this case.
Prior to the 2003 amendments, Florida law required unmarried putative biological fathers to take some type of affirmative action toward establishing their parental rights to a child, prior to the filing of a petition for adoption involving that child, in order to be able to assert any parental *71 right or interest relative to the child in the context of the adoption proceeding. See In Re A.J.B., 548 So.2d 906, 908 (Fla. 1st DCA 1989) (holding that, in In Re Adoption of Mullenix, 359 So.2d 65 (Fla. 1st DCA 1978), and Wylie v. Botos, 416 So.2d 1253 (Fla. 4th DCA 1982), the courts "recognized that section 63.062 imposes upon a natural father the duty to take some type of affirmative action in order to make his consent . . . a prerequisite to the child's adoption."). Clearly, given the legislative intent provisions adopted with the 2003 amendments to the Florida Adoption Act, the Legislature did not intend, through the amendments, to grant unmarried putative biological fathers greater rights than existed under the statute prior to the 2003 amendments.
For all of these reasons, I would affirm.
NOTES
[1] The adoption would not only solve the offending mother's difficulty with the dependency proceedings and attending drug tests, but it would also, presumably, allow J.M. and her mother (but not J.M. and her father) to have continued contact.
[2] If the Legislature wished to limit this provision to only a formal paternity adjudication, it could have easily done so by expressly stating the limitation or cross referencing the paternity statute.
[3] Some examples of court proceedings that could establish the identity of a child's father would include: a father or a child's right to recover civil damages under the wrongful death statute, section 768.21(4), Florida Statutes; a father's financial responsibility for a juvenile placed in detention under section 985.215(6), Florida Statutes; and a father's potential criminal liability for his minor child's unsupervised possession of a firearm under section 790.22(4), Florida Statutes.
[4] It is difficult to conceive the burden that would confront the trial courts and litigants if material facts required more than the acceptance and reliance by every interested party, as was true here, before they could be "established."
[5] See § 39.701, Fla. Stat. (2004).
[6] The term "master" was replaced with "magistrate" throughout the Florida Statutes, and various rules of court procedure, after the proceedings referenced in the text. See generally Amendments to The Florida Rules of Appellate Procedure, The Florida Rules of Civil Procedure, The Florida Rules of Criminal Procedure, The Florida Family Law Rules of Procedure, The Florida Rules of Juvenile Procedure, and The Florida Probate Rules, 887 So.2d 1090 (Fla.2004).
[7] Examples of such protracted, harmful legal battles include those involving "Baby Sam" in Alabama, where the birth mother misrepresented the identity of the child's biological father during adoption proceedings and protracted litigation between the adoptive parents and the biological father ensued, see generally Ex Parte C.V., 810 So.2d 700 (Ala.2001), and "Baby Richard" in Illinois, where protracted litigation resulted from the birth mother failing to disclose the biological father's identity during adoption proceedings and telling the biological father that the child had died shortly after birth. See generally In re Petition of Doe, 159 Ill.2d 347, 202 Ill.Dec. 535, 638 N.E.2d 181 (1994).
[8] The staff analysis of House Bill 835, which ultimately became the chapter law enacting these provisions, see ch.2003-58, §§ 1, 10, at 458, 470, Laws of Fla., succinctly summarized the purpose of these sections as follows:

Makes . . . legislative finding[s] that the interests of the state, the mother, the child, and the adoptive parents outweigh the interests of an unwed biological father who does not take action in a timely manner to establish and demonstrate a relationship with his child; and that the unwed father has the primary responsibility to protect his rights, and is presumed to know that his child may be adopted without his consent unless he complies with the provisions of this legislation and demonstrates a prompt and full commitment to parental responsibilities.
Fla. H.R. Comm. on Jud., HB 835 (2003) Staff Analysis 1 (Apr. 2, 2003).
[9] See, e.g., In Re Petition to Adopt O.J.M., 293 Ill.App.3d 49, 227 Ill.Dec. 190, 687 N.E.2d 113 (1997) (holding that birth mother's misrepresentation during adoption proceedings that another man was child's father did not excuse biological father's failure to comply with registration requirements of that state's putative father registry statute); Heidbreder v. Carton, 645 N.W.2d 355 (Minn.2002) (rejecting biological father's "substantial compliance" argument where his registration of his claim of paternity was one day late, and commenting that, even though birth mother actively concealed her whereabouts during the last stage of her pregnancy, recognition of such a "substantial compliance" exception to that state's registration requirements would weaken the permanence and stability putative father registries provide adopted children); Hylland v. Doe, 126 Or.App. 86, 867 P.2d 551 (1994) (holding that trial court properly entered summary judgment against unmarried biological father in his post-adoption action challenging the validity of Oregon adoption judgment because, even though he had filed paternity action in California days after the child's birth, he had failed to timely comply with the requirements of Oregon's putative father registry statute prior to the child's placement with the adoptive parents); C.F. v. D.D., 984 P.2d 967 (Utah 1999) (holding that unmarried non-resident biological father lost any parental right or interest he may have had to his child, who was born in Utah, by failing to register with Utah's putative father registry, even though he had made repeated attempts to register with Washington's putative father registry where he resided at time of child's birth); Sanchez v. L.D.S. Social Services, 680 P.2d 753 (Utah 1984) (upholding constitutionality of Utah's putative father registry provisions in face of challenge brought by unmarried biological father who attempted to timely register with that state's putative father registry, but failed to actually accomplish registration until one day later after child had already been placed by mother with adoption agency); Beltran v. Allan, 926 P.2d 892 (Utah Ct.App.1996) (holding that trial court properly entered summary judgment against unmarried biological father in his action to obtain custody of child born in Utah because, even though he had filed paternity action in California weeks before child's birth, he had made no attempt to register his claim of paternity with Utah's putative father registry); In Re Adoption of W., 904 P.2d 1113 (Utah Ct.App.1995) (holding that, even though unmarried birth mother made false statement of fact in adoption proceeding that she did not know identity of child's biological father, biological father's failure to timely comply with the requirements of state's putative father registry obviated the need for him to consent to adoption).